UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

THOMAS WAYNE OVERBAY, # 289895 )
                                )
v.                              )          NO. 2:07-CV-155
                                )
HOWARD CARLTON, Warden          )

## MEMORANDUM OPINION

Proceeding *pro se*, Tennessee prisoner Thomas Wayne Overbay brings this petition for a writ of habeas corpus, 28 U.S.C. § 2254, seeking relief from his alleged illegal confinement under multiple state court convictions for sex-related crimes. [Doc. 1]. Both parties have filed motions, the first of which is a motion to dismiss brought by Howard Carlton, Warden of the facility where petitioner is housed. [Doc. 7]. Respondent Warden has also submitted a supporting brief and copies of petitioner's state court record. [Docs. 7, Attach. No. 1, and 8]. The second motion involves petitioner's request to hold these proceedings in abeyance, pending exhaustion in the state courts of one of his federal claims. [Doc. 9]. Both motions are ready to be resolved.

### I. Procedural Background

In mid-1998, petitioner was convicted by a jury in the Criminal Court for Sullivan County, Tennessee of four counts of aggravated sexual battery and ten counts

of rape of a child. For these convictions, he received an effective 48-year sentence of imprisonment. Petitioner appealed, and his convictions were affirmed, as was his sentence. *State v. Overbay*, No. E1999-00840-CCA-R3-CD, 2000 WL 1246617 (Tenn. Crim. App. Sept. 5, 2000), *perm. app. den.* (Tenn. 2001).

In 2002, petitioner filed a *pro se* application for post-conviction relief. Following a hearing on the application, the trial court denied relief and its decision was affirmed on appeal. *Overbay v. State*, No. E2006-00518-CCA-R3-PC, 2007 WL 283142 (Tenn. Crim. App. Feb. 1, 2007), *perm. app. den.* (Tenn. 2007). This petition followed on June 19, 2007.

## II. Factual Background

The following factual account is taken from the state appellate court's opinion on direct review. *See Overbay*, 2000 WL 1246617, at *1-*4.

From September 1995 to the first week of January of 1996, petitioner lived with his girlfriend, Martha Lynn Lawson, their infant son, and three of her children in Kingsport, Tennessee. During the week of September 21, 1995, Ms. Lawson worked the "graveyard" shift from 10 p.m. to 6 a.m. at a local restaurant, arriving home from 6:30 a.m to 7:30 a.m, while petitioner left home for work at 5:30 a.m. to 6:00 a.m. Because of the gap of up to 2 hours which would have left the children unattended for this length of time, different adults came to the residence the

2

night before or early in the morning and watched them until their mother returned from work. For some six weeks during the fall of 1995, Ms. Lawson's sister, Tammy Jennings, who lived with the couple, occasionally helped with childcare, as did two of petitioner's sisters, and several other persons. Typically, the children spent the weekends at the homes of different family members, but during the weekday evenings, when Ms. Lawson was working, petitioner frequently was responsible for caring for the children.

Those children, including five-year-old SKJ, were in petitioner's care during the evenings of the Fall and Winter of 1995 until sometime in January 1996. SKJ testified at trial that petitioner would wait until her mother left to work the "graveyard" shift, then would sexually abuse her by placing his mouth on her genitals, touching her genitals, touching her genitals with his penis, and requiring her to touch his penis and perform fellatio on him. She stated that petitioner had abused her "a lot" and more than five times, though she could not remember the exact number of times this had occurred, and that she had told no one about the abuse because he had warned her that he would "whip" her if she told. SKJ also stated that she was afraid of petitioner.

On cross-examination, SKJ testified that the abuse happened every day except Friday, Saturday, and Sunday. In response to defense counsel's question, that

"one of the things you said he did to you was he put his private part in your private part, is that right?" SKJ answered, "Right," and she agreed that this occurred more than ten times, but stated that she did not know if it had occurred more than twenty times. She also agreed that petitioner touched his mouth to her genitals every day of the week.

In March of 1996, after telling her grandmother about the abuse, SKJ was examined by a physician who testified at trial that no genital abnormalities were shown in the general exam, but that a closer examination with a magnification device showed that her hymen was "blunted" or thinner than normal and that her hymenal opening was larger than normal—an abnormality consistent with penetration by a human finger or tongue and, perhaps, with partial penetration by an adult male penis. The physician acknowledged that total penetration by a penis ordinarily would result in extensive damage and subsequent scarring and that her examination uncovered no evidence to suggest that this type of trauma had occurred.

Other proof offered were incriminating statements petitioner had made to Ms. Lawson on four occasions. According to her testimony, when she had questioned petitioner about SKJ's allegations, "he never said he wasn't guilty, he didn't say he wasn't guilty, he just said he wasn't going to jail for this. He was not going to jail for this. That was all that was ever said." When Ms. Lawson brought up

4

the subject the second time, he responded in this manner: "He never admitted, he never said, he just was always saying he wasn't going to go to jail for this." Ms. Lawson also testified that, another time, petitioner said that "what happened to [SKJ] it was [Ms. Lawson's] fault, because---because it didn't have anything to do with him, that it wasn't planned .... He said the only way that he could find relief he was at home with my children while I worked and he didn't go out anywhere." [She explained, referencing the latter statement, that their sexual relationship was non-existent during this period.] Lastly, Ms. Lawson reported that petitioner had "said that he was not going to go to jail for this. If he went to jail, he was going to go to jail for something else. And then if I happened to be around and he happened to be arrested, he would just kill me and take care of it. He kept asking me if I knew what they did to people when they went to prison for things like this."

Petitioner denied the charges and called witnesses to bolster his testimony at trial. One of his friends testified that she saw no indications of child abuse during her frequent visits to his home in the Fall of 1995. This witness's daughter, likewise, testified that she had seen and heard nothing to indicate that petitioner was sexually abusing SKJ the two nights she spent at the residence in 1995, babysitting the children. A Kingsport Police Department Detective was also called as a witness. She stated that she had interviewed SKJ on March 4, 1996, and that her

5

interview notes reflected that SKJ had said that petitioner "never touched my private with his private." However, the officer witness also acknowledged that this was SKJ's first interview and explained that it was difficult to get abused children to talk during the first interview. During later interviews, SKJ told the detective that petitioner touched her genital area, made her touch his penis, made her touch her mouth on his penis, and had her "sit on him."

Petitioner also offered the testimony of a physician and of a Registered Nurse with the health department. The physician stated that he personally had not examined SKJ but had reviewed photographs of her genitalia taken by the examining physician. He testified that SKJ's thinner-than-average hymen and larger-than-average hymenal opening were not abnormal for a child of her age and weight. The public health nurse testified that, when she performed a physical examination of SKJ during a health screening at the Health Department on November 14, 1995, her notes reflected that she had observed no abnormalities during her visual exam of SKJ's external genitalia.

The jury found petitioner guilty of ten counts of child rape (involving sexual penetration of the victim) and four counts of aggravated sexual battery (sexual contact without penetration).

# III. Discussion

A. **Petitioner's Motion to Abate**

In this motion, petitioner seeks to have his case stayed to enable him to return to state courts to exhaust a claim. As indicated in his motion, petitioner desires to present in a state habeas corpus petition issues concerning his attorney's failure to object to sentence enhancements under the rule in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004). The fourth ground for habeas corpus relief contained in the federal petition involves ineffective-assistance-of-counsel issues tied to *Apprendi*, and *Blakely*.[1] Presumably, these are the same issues petitioner seeks to raise in state court.

As a precondition to habeas corpus relief, a petitioner must demonstrate that he has exhausted all available state court remedies, or that there is an absence of state corrective process, or that resort to those remedies would be futile. 28 U.S.C. § 2254(b)(1). A federal district court must dismiss a mixed habeas petition–one which

---

[1] In the former case, the Supreme Court held that any fact which increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt, and in the latter case, it extended the *Apprendi* rule to a sentence-increase imposed under state sentencing law and held that the "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." *Blakely*, 542 U.S. at 303 (emphasis in original) (citation omitted).

contains both exhausted and unexhausted claims. *Pliler v. Ford*, 542 U.S. 225, 229 (2004) (citing *Rose v. Lundy*, 455 U.S. 509, 510 (1982)).

Nevertheless, a federal court is authorized to stay and abate a "mixed" habeas corpus petition filed close to the one-year statute of limitations in 28 U.S.C. § 2244(d), but only if a petitioner shows good cause for failing to exhaust his claim in the state courts. *Rhines v. Weber*, 544 U.S. 269, 277 (2005). A petitioner must also demonstrate that his claims are not groundless and that he has not intentionally engaged in dilatory tactics. *Id*. However, the stay-and-abeyance procedure is available only if the petition contains *unexhausted* claims, which are those claims of constitutional error which may still be presented to state courts for disposition. As the Sixth Circuit has explained:

> "Exhaustion is a problem only if the state still provides a remedy for the habeas petitioner to pursue, thus providing the state courts an opportunity to correct a constitutionally infirm state court conviction. If no remedy exists, and the substance of a claim has not been presented to the state courts, no exhaustion problem exists; rather, it is a problem of determining whether cause and prejudice exist to excuse the failure to present the claim in the state courts."

*Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

That is the situation here. Petitioner has no remaining state court avenues in which to present his claims for disposition. For example, petitioner indicates that he intends to raise his claims in a state habeas corpus petition. Under Tennessee law,

8

however, a prisoner may file a habeas corpus petition in its courts only to challenge a judgment, which, on its face, is void because the court lacked jurisdiction or authority to render the judgment or because his sentence has expired. *Archer v. State*, 851 S.W.2d 157, 164 (Tenn. 1993). A claim of ineffective assistance of counsel is not cognizable in a state habeas corpus petition since it does not render a judgment void, but only voidable. *Johnson v. Dotson,* 2007 WL 1003116, at *1 (Tenn. Crim. App. Apr. 3, 2007), *perm. app. den*. (Tenn.2007) (citing *Luttrell v. State,* 644 S.W.2d 408, 409 (Tenn. Crim. App. 1982)).

A *Blakely* violation, likewise, is not a cognizable ground either and, according to the state courts, *Blakely* does not apply retroactively to cases on collateral review. *Fortner v. State*, 2008 W. 1839157, at *4 - *5 (Tenn. Crim. App. Apr. 24, 2008) (listing cases). *See also Blakely*, 542 U.S. at 323 ("[W]e [held] in *Schriro v. Summerlin* [542 U.S. 348 (2004)] that *Ring* [*v. Arizona*, 536 U.S. 584 (2002)] (and *a fortiori Apprendi*) does not apply retroactively on habeas review..."); *Goode v. United States*, 305 F.3d 378 (6th Cir. 2002) (*Apprendi* is not retroactive in initial motions to vacate under 28 U.S.C. § 2255).

And, if petitioner intended to pursue post-conviction relief once more, he would have to overcome the "second-petition" bar to filing another post-conviction application or meet the rigorous standard required to sustain a motion to reopen his

9

original post-conviction proceedings, *see* Tenn. Code Ann.§ 40-30-102(c) and § 40-30-117, which he could not meet under the circumstances in his case. Because state law clearly forecloses petitioner's return to Tennessee courts and because it now is impossible for him to exhaust the claims in those courts, the stay-and-abatement procedure does not apply to his claims of attorney error involving *Apprendi* and *Blakely*.

Therefore, petitioner's motion to abate his petition [Doc. 9] will be **DENIED**.

## B. **Respondent's Motion to Dismiss**

In the second motion, respondent seeks dismissal of all four claims presented in the petition, arguing that three claims were adjudicated in state courts, that, under the deferential review standards for state court decisions in 28 U.S.C. § 2254, those claims do not warrant habeas corpus relief, and that one claim cannot be considered since it was never offered to the Tennessee courts and not exhausted.[2] To

---

[2] By asserting that petitioner did not exhaust his claim because he has never offered it to the state courts, respondent is invoking the procedural default doctrine. A federal claim which was not presented to the state courts for disposition and which cannot be presented now (due to the lack of any remaining state remedies) is subject to the procedural default doctrine—with its companion rules of cause-and-prejudice and miscarriage-of-justice. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991), *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986).

facilitate discussion, the claims have been divided into two categories—adjudicated claims and procedurally defaulted claims.

1. *Adjudicated Claims*  [Pet., Grounds One, Two and Three].

The standard which controls the review of adjudicated claims is found in 28 U.S.C. § 2254(d). Under this standard, a district court may not grant a writ of habeas corpus for any claim adjudicated on the merits in state court unless the adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d).

Also, a state court's findings of fact are presumed to be accurate and a petitioner bears the burden of rebutting the presumption by clear and convincing evidence. *Spisak v. Mitchell*, 465 F.3d 684, 691 (6th Cir. 2006) (citing 28 U.S.C. § 2254(e)(1)). The presumption of correctness applies not only to express findings of fact, but also to unarticulated findings that are necessary to the state court's conclusions of mixed questions of fact and law. *See Marshall v. Lonberger,* 459 U.S. 422, 433 (1983) (presumption applies to a credibility determination which was implicit in rejection of defendant's claim). Given two permissible views of the

evidence, a fact finder's choice between them cannot be clearly erroneous. *Amadeo v. Zant,* 486 U.S. 214, 226 (1988).

This standard applies to the first three claims advanced in the petition.

a. *Right to Notice* [Pet., Ground One].

In petitioner's initial claim, he asserts that he was denied his constitutional right to be informed of the nature and cause of the accusations against him, as secured to him by the Sixth Amendment to the United States Constitution. In elaborating on the claim, petitioner contends that he was never provided with information which would pinpoint the nature, time, or place of the charged offenses. It is also his position that this lack of notice, at the same time, denied him an alibi defense.

In his direct appeal, petitioner phrased this claim as a challenge to the inadequate notice provided in the bill of particulars. Citing to state law, the state appellate court explained that a bill of particulars serves to inform a defendant of the circumstances surrounding the charge, such as the nature, time, date, or location of the offenses, so that he may prepare his defense, avoid prejudicial surprise at trial, and preserve a plea of double jeopardy. However, because of the unique character of a sexual abuse case involving a child, when a minor victim—and, hence, the prosecution—is unable to supply either a precise date on which the offense allegedly

12

occurred or even an approximate time of the alleged abuse by means of descriptive reference (i.e., near an event such as a birthday, a holiday, etc.), a conviction may stand if it does not appear during the course of the trial that the lack of specific details has hindered the defense.  The state court also noted that the prosecution is required to disclose in a bill of particulars any information in its actual or constructive possession which helps to pinpoint the time frame of the indictment or face reversal of the conviction.

To the extent that petitioner's claim is founded on state law, it does not raise an issue under the Constitution and is not a cognizable habeas corpus claim.  *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (finding that federal habeas corpus relief does not lie for errors of state law that do not rise to the level of a constitutional violation).  Thus, a federal court may not issue a writ of habeas corpus based on a perceived error of state law.  *Pulley v. Harris*, 465 U.S. 37 (1984).

However, petitioner's assertion that he was denied his Sixth Amendment right "to be informed of the nature and cause of the accusation," is a recognizable habeas corpus claim.  U. S. Const. amend. VI.  The Tennessee Court of Criminal Appeals implicitly acknowledged the federal nature of the claim by citing extensively to *State v. Byrd*, 820 S.W.2d 739 (Tenn. 1991), where the state supreme court observed that the Sixth Amendment to the United States Constitution required more

in a bill of particulars than a mere allegation by the prosecution that it could not give specific dates on which the offenses occurred. *State v. Overbay*, 2000 WL 1246617, at *4-8.

The issue of fair notice was carried to the Tennessee Court of Criminal Appeals, which first iterated the facts surrounding the claim. Petitioner had filed a discovery motion in the trial court, requesting information concerning "the exact date, time and place of the alleged offense," to which the prosecution responded, in part, that the "dates of the offenses are contained in the Presentment. The State cannot be more specific. These offenses occurred at the victim's residence at 1382 Waverly Road, Kingsport, Tennessee in the evening hours while her mother was at work at the Waffle House in Kingsport."

Apparently dissatisfied with the state's offering, petitioner filed a "motion to compel adequate response to motion for bill of particulars," prompting the prosecution to respond that:

> "[The] State cannot be more specific as to the dates of the offenses due to the fact that the allegations were made by a child," and the "State would specifically state that the penetration was by the Defendant orally penetrating the victim's vagina and by the Defendant penetrating the victim's mouth with his penis, and by placing his penis into the victim's vagina and the Defendant placing his fingers and hands into the victim's vagina."

*Overbay*, 2000 WL 1246617, at *5.

The state court found that the information contained in the prosecution's bill of particulars and its additional response enabled petitioner to prepare his defense and avoid unfair surprise at trial. More specifically, it found that petitioner knew where the offenses were alleged to have occurred, the span of time and time of day when they purportedly occurred, and the nature of the sexual contact claimed by the victim. Concluding that petitioner had not shown that he suffered prejudice due to the lack of the exact dates of the offenses and rejecting all his arguments to the contrary, the state court declined to grant relief on the claim.

Though the provision in the Fifth Amendment which guarantees a federal criminal defendant an indictment or presentment by a Grand Jury does not apply to the states, *see Branzburg v. Hayes*, 408 U.S. 665, 687-88 (1972), the Constitution does require that whatever method a state selects to charge a criminal offense, the accused must receive "notice of the specific charge." *Cole v. Arkansas*, 333 U.S. 196, 201 (1948) (holding that "notice of the specific charge . . . [is] among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal"). And, the notice must be adequate so as to enable the criminal accused to formulate a defense to the charge. *Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir. 1984). *See also Russell v. United States*, 369 U.S. 749, 763-64 (1962) (finding

adequate notice of the charges to be one of three specificity requirements in a charging instrument). Describing the offense "with some precision and certainty ... as will enable a presumptively innocent man to prepare for trial" will satisfy the constitutional requirement of fair notice. *Koontz*, 731 F.2d at 369. However, "an indictment which fairly but imperfectly informs the accused of the offense for which he is to be tried does not give rise to a constitutional issue cognizable on habeas corpus." *Mira v. Marshall*, 806 F.2d 636 (6th Cir 1986).

Applying the *Russell* criteria for evaluating the specificity of a charging document, the Sixth Circuit has pointed out that prosecutors should be as specific as possible in setting forth the dates and times of abuse offenses, but has also recognized that the constitutional notice requirement will tolerate fairly large time frames given "the reality of situations where young child victims are involved," since those victims may be unable to remember exact dates and times. *Valentine v. Konteh*, 395 F.3d 626, 632 (6th Cir. 2005). On the other hand, where "[t]he indictment, the bill of particulars, and even the evidence at trial fail[s] to apprise the defendant of what occurrences formed the bases of the criminal charges he face[s]," the constitutional mandate of fair notice is violated. *Id.* at 634. Also, the constitutional right to fair notice is violated by the lack of a distinctive factual basis supporting each count, such as the time-frame, the type of sexual action, or the location or time of day of the

alleged offense—information which will enable a criminal accused to differentiate

between the counts and defend against each individual charge. *Id.* at 633-34.

Count One of the original presentment reads, in relevant part:

> THOMAS WAYNE OVERBAY between on or about September 21 and
> September 27, 1995 in the State and County aforesaid and before the
> finding of this Presentment did unlawfully, intentionally, knowingly, and
> feloniously have sexual penetration of [SKJ], date of birth: July 5, 1990,
> a child less than thirteen years of age, in violation of Tennessee Code
> Annotated, Section 39-13-522...." [Addendum No. 1, p. 3].

Counts two through fourteen read identically, with the exception of the dates

of the offense, which are alleged as sequential weeks, beginning with the week of

September 28 to October 4, 1995, but excluding the week of October 12 - 18 of 1995,

and ending with the five-day period of December 28, 1995 to January 1, 1996.[3] [*Id.*,

pp. 3-7]. The cited statute, i.e., Tenn. Code. Ann. § 39-13-522, sets out the offense

of rape of a child.

According to petitioner's state court record, information on the subject

was incorporated in the presentments, was augmented in the bill of particulars, and

was further supplemented in the prosecution's discovery response and through the

---

[3] Pursuant to defense's motion, on the second day of trial, the trial court
required the state to elect a specific date of each offense rather than allege that each
offense was committed during a weekly span of time. [Addendum No. 3, Tr. T. at 125]
.

State's action in electing to provide an exact date each count of child rape allegedly was committed. These documents narrowed the time-frames [one offense occurred each week the victim's mother worked the "graveyard" shift] and specified the location [the common residence] and the nature of the charged offenses [identifying the methods used to commit the offenses as oral and vaginal penetration of the victim]. The time-frame of the charged offenses was tightened still more by: (1) the victim's testimony at trial that the sexual assaults occurred Monday through Thursday, but not Friday through Sunday, and that they occurred "a lot"; (2) testimony offered by the victim's mother as to the dates she worked that particular shift; (3) evidence disclosed [and available before the trial] in Waffle House work records which established the weeks and days the victim's mother worked the 10 p.m. to 6 a.m. shift; and (4) the prosecution's election of dates which pinpointed the specific dates of each alleged crime.

Moreover, the victim testified in detail as to the precise nature of the sexual abuse inflicted by petitioner. As the state court described it: "SKJ testified that [petitioner] placed his mouth on and manually touched [her] genitals, required [her] to touch his penis and perform fellatio, touched [her] genitals with his penis, and penetrated [her] vagina with his penis." *Overbay*, 2000 WL 1246617, at *5.

Finally, as found by the state court, petitioner did not show that his trial preparation or method of defense would have changed had the charging instruments and ancillary documents contained "exact details of the alleged offenses, the frequency of the offenses, and the fact that the offenses did not occur on Friday, Saturday, and Sunday." *Id.*, at *6.

As noted, a charging instrument will pass constitutional muster if it delineates the offense with sufficient precision so as to apprise the accused of the crime charged. *Koontz*, 731 F.2d at 369. Absent some kind of harmful effect to the defense from the lack of notice, prejudice will not be found. *Id.*, at 370.

The state-court decision (i.e., that the bill of particulars, as supplemented by information in the State's response to petitioner's discovery motion, adequately apprised petitioner of the crimes for which he was charged and did not prejudice him and its implicit decision as to "fair notice") must stand unless it is contrary to or an unreasonable application of the relevant Supreme Court precedent requiring "notice of the specific charge" or is based on unreasonable factual determinations. Because the state court decision was none of these things, petitioner is not entitled to habeas corpus relief.

b. *Brady Violation* [Pet., Ground Two].

In his second claim, petitioner asserts that the prosecution suppressed material exculpatory evidence and, thereby, denied him his right to due process of law as secured to him by the Fourteenth Amendment to the United States Constitution. More specifically, petitioner contends that, prior to the trial, the prosecution failed to provide the defense with the victim's statement that he never placed his penis into her vagina.

Due process is violated where the State suppresses exculpatory, material evidence, requested by the defense. *Brady v. Maryland,* 373 U.S. 83, 87 (1963). To succeed on a suppression claim, a petitioner must show that the evidence was favorable to a defendant, that it was withheld by the prosecution, and that he suffered prejudice as a result. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (applying *Brady*). Impeachment evidence is encompassed by *Brady*, *id.* at 280, and such evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 682 (1985). But, the "mere possibility" that the evidence might have aided the defense or might have affected the outcome of the trial does not satisfy the materiality element. *United States v. Agurs*, 427 U.S. 97, 109-10 (1976). Also, a belated disclosure of evidence violates *Brady* only where a

petitioner can show that the delay itself caused prejudice. *O'Hara v. Brigano*, 499 F.3d 492, 502 (6th Cir. 2007).

The state appellate court, citing to *Brady* and its progeny for the relevant legal principles, reviewed petitioner's claim. It first pointed out that the interviewing officer's notes which contained the victim's statement were not turned over before the trial, but were disclosed during the trial, after the victim testified. Following the disclosure, petitioner moved to dismiss, but the trial court determined that the notes were not material and denied the motion.

The higher state court found that the victim's statement that petitioner "never touched my private with his private" was potentially exculpatory, but agreed with the trial court that the statement was not material. The materiality determination devolved from the state court's factual findings that the notes were disclosed before the victim was excused as a witness, that petitioner was able to cross-examine the victim concerning the statement, that petitioner was also able to call as a defense witness the officer who took the notes, that the victim's statement was read into the record, that the notes were made an exhibit and published to the jury, and, finally, that petitioner offered a strong defense, which included medical evidence, regarding penile

penetration.[4] Ultimately concluding that there was no reasonable probability that an earlier revelation of the statement would have resulted in a different outcome, and thus, no violation of *Brady*, the state court declined to grant relief.

The factual findings referenced above lead to the conclusion that the state court did not apply *Brady* unreasonably by determining that the late disclosure of the evidence did not prejudice the defense and did not deny petitioner his due process right to a fair trial. *See O'Hara*, 499 F.3d at 503 (tardy disclosure of rape victim's statement did not result in prejudice where defense did not seek a continuance, did not question the victim about the statement when he was offered the chance, and did not explain how earlier disclosure might have changed the outcome); *United States v. Alvarez*, 86 F.3d 901, 905 (9th Cir. 1996) (no *Brady* violation in delayed disclosure of facially exculpatory notes because, after the disclosure, the note taker was subjected to cross-examination by defense and, thus, was not prejudiced by delay). Therefore, the state court's decision disposing of this claim must remain undisturbed because the "unreasonable application" prong of § 2254(d) has not been met in this case.

c. <u>*Ineffective Assistance of Counsel*</u> [Pet., Ground Three].

---

[4] These factual findings must be presumed correct since petitioner has not refuted them by clear and convincing proof. 28 U.S.C. § 2254(d)(2).

22

In his next claim, petitioner maintains that his attorney gave him ineffective assistance by failing to explain the details of a plea offer extended by the State, by failing to explain that petitioner would be required to serve 100% of his sentence, instead of 30%, and by misrepresenting petitioner's chance of acquittal.

To succeed on a claim of ineffective assistance of counsel, petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced his defense so as to render the trial unfair and the result unreliable. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A reviewing court's scrutiny of counsel's performance is highly deferential. *Id.* at 694. To demonstrate deficient performance, a petitioner must show that his counsel's representation fell below an objective standard of reasonableness on the facts of the particular case, viewed as of the time of counsel's conduct. *Id.* at 688, 693-94. To show prejudice, a petitioner must demonstrate that there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different *Id.* at 694. A finding of no prejudice provides an adequate ground for rejecting an ineffective assistance of counsel claim, even if a deficient performance is assumed. *Id.* at 687.

These alleged attorney errors were raised in the post-conviction court and, when the claims failed there, they were raised again on appeal. *Overbay v. State*, 2007 WL 283142 (Tenn.Crim.App. Feb. 1, 2007.) The state appellate court began its

review of the claimed shortcomings by reiterating the testimony given by petitioner, his father, and petitioner's attorney during the post-conviction hearing. According to petitioner's testimony, his lawyer told him that he would serve thirty percent of the eight-year sentence in the plea offer or "two years and some odd months and 24 days or something like that." Counsel informed him that, if he went to trial, he could receive a sentence of "25 years or something like that" for each count of conviction and estimated that he had a seventy-five percent chance of acquittal, but did not tell him, insofar as petitioner could recall, the percentage of this sentence he would be required to serve. Petitioner's father offered similar testimony on the 2 ½-year sentence, which was tied to the plea offer, and the estimation of a 75 percent chance of acquittal.

The trial attorney testified also. He stated, however, that he had conveyed the eight-year plea offer to his client and his father but also repeatedly had advised petitioner that a single conviction on any of the fourteen counts of child rape would result in a sentence of at least fifteen years and as much as twenty-five years, given that the crimes were alleged to have occurred shortly after a modification of the law which dramatically affected the percentage of service for sentences. The lawyer also averred that he had told petitioner that the length of a sentence following a trial would be far greater than the eight-year sentence offered as part of the plea bargain

and that he had not given petitioner a prediction of the probability of acquittal. Counsel characterized such a forecast as "preposterous" and insisted that this was not something he would ever do.

The Court of Criminal Appeals then cited to *Strickland*, among other cases, as containing the principle for evaluating claims of ineffective assistance and pointed out that the trial court had accredited counsel's testimony and disbelieved that offered by petitioner and his father. Thereafter, the state appellate court determined that petitioner had failed to establish a factual basis for his claims of deficient performance or prejudice and declined to grant post-conviction relief.

The presumption of correctness afforded to the state court's findings of fact underlying its resolution of the ineffectiveness claim encompasses implicit factfindings and those based on credibility determinations. The Court will defer to any such findings because petitioner has not presented clear and convincing evidence to refute them.

Petitioner is entitled to relief under § 2254 only if he can show that the state court's decision that his attorney did not render ineffective assistance is contrary to or an unreasonable application of the clearly established Supreme Court precedent or an unreasonable determination of the facts in light of the evidence presented in the

state court. 28 U.S.C.A. § 2254(d)(1)-(2). Petitioner has presented nothing to carry this burden.

This Court now finds that, in view of the testimony of petitioner's counsel that he communicated the plea offer to petitioner; that he explained the eight-year sentence it carried; that, likewise, he explained that the length of a sentence upon a conviction on any one count of child rape would be far greater than the eight years offered by the State; and that he had not given petitioner any forecast as to his chance of acquittal—testimony which the state court found credible, the Tennessee Court of Criminal Appeals' ruling that petitioner was not denied his constitutional right to effective assistance of counsel is not an unreasonable application of, or contrary to, *Strickland*. The writ will not issue with respect to this claim.

2. *Procedurally Defaulted Claim* [Pet., Ground Four].

The final ground for relief is another claim of ineffective assistance of counsel. The alleged error is counsel's failure to raise an issue under the authority of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004). This claim, according to respondent, was not raised in state court and cannot be reviewed here.

As observed earlier, the law has long been established that a state prisoner must exhaust his available state court remedies before petitioning a federal

court for a writ of habeas corpus. 28 U.S.C. § 2254(b) (1). Exhaustion requires that a petitioner fairly present his federal claim first to the state courts, in a procedural context where a merits review is likely. *Castille v. Peoples,* 489 U.S. 346, 351 (1989). A petitioner who has failed in this regard and who is now barred by a state procedural rule from returning with his claim to those courts has met the technical requirements of exhaustion (i.e. there are no state remedies left to exhaust) and is deemed to have exhausted his state remedies, but to have done so by way of a procedural default. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

When a state invokes a procedural default defense, a court in the Sixth Circuit must apply a four-factor analysis to determine: 1) whether there is a procedural rule which applied to a petitioner's claim and whether a petitioner complied with the rule; 2) whether the procedural rule was actually enforced against a petitioner; 3) whether that rule is an adequate and independent state ground sufficient to block habeas review; and 4) whether a petitioner can demonstrate cause for his failure to comply with the rule and prejudice resulting from the alleged constitutional violation. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

In his habeas corpus application, petitioner admits that he has "not yet" presented this instance of alleged ineffective assistance to the Tennessee courts. [Doc. 1, Pet. at 11]. This amounts to "technical" exhaustion and, at the same time, a

27

procedural default, which can only be overcome upon a showing of cause and prejudice. *Coleman*, 501 U.S. at 750; *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). Petitioner offers no cause or prejudice to overcome the default and, thus, federal review cannot be had.

## IV. **Conclusion**

Accordingly, petitioner's motion to abate will be **DENIED** [Doc. 9], respondent's motion to dismiss will be **GRANTED** [Doc. 7], and this petition will be **DISMISSED**.

## V. **Certificate of Appealability**

Finally, the Court must decide whether to issue a certificate of appealability (COA). Petitioner qualifies for issuance of a COA if he has made a substantial showing of the denial of a constitutional right; he makes such a showing by demonstrating that reasonable jurists might question the correctness of the Court's procedural rulings or its assessment of his constitutional claims. *See Slack v. McDaniel,* 529 U.S. 473 (2000). The Court has found that the last claim was procedurally defaulted, while others (if, in fact, they were raised) are not cognizable. The Court also has concluded that the rest of the claims were adjudicated in state court and would not support habeas corpus relief because, after an examination of the state

court decisions, the record, and the relevant governing law in Supreme Court cases, those decisions did not run contrary to well established federal law, did not reflect that the state courts had unreasonably applied that law, and did not demonstrate that the state courts had disposed of those claims by unreasonably determining the facts before those courts.

The Court now finds that reasonable jurists could not disagree with the resolution of these claims and could not conclude that they "are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003), and will **DENY** issuance of a COA.  28 U.S.C. § 2253; Fed. R. App. P. 22(b).

A separate order will enter.


**ENTER**:


s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE